**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BAO DUONG, Individually and on Behalf of All Others Similarly Situated,<br>Plaintiff,<br><br>v.<br><br>GAUZY LTD., EYAL PESO, MEIR PELEG, MICHAEL DONNELLY, GAL GITTER, ALEXANDER BABITSKY, DANNY ALLOUCHE, EZRIEL JESSE KLEIN, BARCLAYS CAPITAL INC., TD SECURITIES (USA) LLC, STIFEL, NICOLAUS & COMPANY INC., B. RILEY SECURITIES, INC., and BEECH HILL SECURITIES, INC.,<br><br>Defendants. | **Case No. 1:25-cv-10179-VM**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

**FIRST AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiffs Alan Yakuboff and Troy Morrison ("Plaintiffs" or "Lead Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' First Amended Complaint for Violations of the Federal Securities Laws (hereafter the "Amended Complaint" or "FAC") against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Gauzy Ltd. ("Gauzy" or the "Company"), analysts' reports and advisories about the Company, interviews with

knowledgeable former employees of the Company, French regulatory documents that Plaintiffs' counsel was able to procure, and information obtainable on the Internet. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. Gauzy is a public company with its primary facilities in France, Israel, and the United States. Gauzy, together with its subsidiaries, makes products that change glass transparency for automotive, aviation, and architectural markets, as well as producing safety cameras for trucks. This is a federal securities class action based upon violations of the Securities Act of 1933 ("Securities Act") in connection with Gauzy's June 2024 initial public offering ("IPO") in the United States, and violations of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder arising from statements made to investors during a discrete period in 2025.

2. Plaintiffs bring this lawsuit on behalf of the following two Classes:

   a. **Securities Act Class**: a Class consisting of all persons who purchased or otherwise acquired Gauzy's common stock pursuant to or traceable to the defective registration statement upon which the Company went public on June 6, 2024, consisting of the Form F-1 initially filed with the SEC on April 15, 2024, and amendments thereto filed on Forms F-1/A on May 20, 2024, May 29, 2024, and June 5, 2024 (the body of which was incorporated into the final prospectus) (collectively, the "Defective Registration Statement"). The Securities Act Class asserts claims under Sections 11 and 15 of the Securities Act. These claims are grounded in strict liability, and do not assert intent to defraud.

   b. **Exchange Act Class**: a Class consisting of all persons who purchased or otherwise acquired Gauzy's common stock between March 11, 2025 and November 13, 2025, both dates inclusive. The Exchange Act Class asserts claims under Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

Excluded from both Classes are: Defendants, as defined herein, former and current officers, senior managers, and directors of Gauzy and its subsidiaries, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, related entities, joint ventures, family members, legal representatives, heirs, successors or assigns of any of the above.

3. Gauzy is an Israeli corporation formed in 2009. In 2017, it became a licensee of a light control technology used to dim aviation and automotive glass known as a suspended particle device ("SPD").

4. In February 2022, Gauzy announced its transformative acquisition of Vision Lite SAS ("Vision Lite"), Vision Systems Corporate SAS ("Vision Systems Corporate"), Vision Systems SAS ("Vision Systems"), and Safety Tech SAS ("Safety Tech Co.") (collectively, "Vision"). Vision was then a global leader in light control products for aeronautics and automotive markets, and camera-based systems for trucks. At the time of the IPO, the Vision companies were the most important subsidiaries of Gauzy and were structured as follows:



5. The Defective Registration Statement touted the Vision acquisition as a significant milestone in Gauzy's expansion efforts and an important part of efforts to enhance Gauzy's customer base, geographic reach, and production capabilities. However, it negligently omitted crucial information about the precarious financial position, prospects, and regulatory history of Vision, which posed serious threats to Gauzy itself.

6. In truth, Vision had been on the brink of insolvency since at least 2021. The issue was so severe that it invoked a French regulatory mechanism requiring the primary Vision Lite entity to formally consider dissolution in 2021, requiring Vision Systems Corporate to do so in 2023, Vision Systems to do so in 2024, and Safety Tech Co. to do so in 2024. These financial problems were admitted in French regulatory documents, not easily obtainable by U.S. investors and not translated into English. All mention of these French regulatory documents, including consideration of dissolution, were omitted from the Defective Registration Statement. Other problems with Vision were also omitted, including known labor disputes in France and problems with paying vendors and employees.

7. After the February 2022 acquisition, two well-placed confidential witnesses ("CWs") confirmed that Gauzy's Chief Executive Officer ("CEO") Eyal Peso and Chief Financial Officer ("CFO") Meir Peleg pressured employees to inflate customer orders in internal sales budgets. These inflated sales budgets were negligently rolled up into the "revenue backlog" touted in the Defective Registration Statement.

8. In 2025, after the IPO and despite worsening financial problems at Gauzy's Vision subsidiaries, Defendants Peso and Peleg continued to misrepresent Gauzy's liquidity and backlog to investors, guiding them to expect sustained growth when the Company was then suffering a

liquidity crisis. Plaintiffs allege that the 2025 misrepresentations were made with intent to mislead investors, or with deliberate recklessness as to whether investors would be misled.

9. The concealed financial difficulties first began to materialize in adverse earnings reports on May 13, 2025, followed by a significant decline in the price of Gauzy shares. But Exchange Act Defendants (defined herein) continued to conceal the truth about Vision's insolvency and Gauzy's liquidity, stemming a further drop. On August 7 and 8, 2025, two board directors resigned. More evidence of Gauzy's financial woes materialized in another adverse earnings report less than a week later, causing further investor losses. Again, Exchange Act Defendants prevented an even further decline by continuing to conceal the full extent of Gauzy's liquidity problems. A month later, another board director resigned.

10. Then, on November 14, 2025, Gauzy admitted in a press release that a French court had "ordered the commencement of French law insolvency proceedings ('Redressement Judiciaire') relating to three subsidiaries of Gauzy located in France." According to the press release, "Redressement Judiciaire are French insolvency proceedings aimed at preserving a company's business and operations, maintaining employment and repaying creditors while allowing for a plan to enable its recovery." The Company further revealed, in the accompanying Form 6-K, that the "commencement of these insolvency proceedings in France constitutes a default under the Company's existing senior secured debt facilities, which if not remedied could lead to an event of default." As a result of the proceedings, Gauzy rescheduled its 2025 third quarter earnings release.

11. On this news, Gauzy's share price fell $2.00 per share, or 49.8%, over two consecutive trading days, to close at $2.02 per share on November 17, 2025, on unusually heavy trading volume.

12. As a result of Exchange Act Defendants' wrongful acts and omissions, and the consequent precipitous decline in the market value of Gauzy's securities, Lead Plaintiffs and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13. The claims asserted herein arise under and pursuant to §§11, and 15 of the Securities Act (15 U.S.C. §§77k, 77l(a)(2) and 77o), and §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78n and 78t(a)) and Rules 10b-5 promulgated thereunder by the SEC (17 C.F.R. §§240.10b-5, 240.14a-9).

14. This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §1331, §22 of the Securities Act, and §27 of the Exchange Act.

15. Venue is proper in this District pursuant to §22 of the Securities Act, 15 U.S.C. §77v, §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District.

16. In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

17. Lead Plaintiff Alan Yakuboff ("Yakuboff"), as set forth in the certification accompanying his Motion for Appointment as Lead Plaintiff (ECF Nos. 15-1, 15-4), purchased and was assigned Gauzy common stock during the Exchange Act Class Period and was damaged upon the revelation of the alleged corrective disclosures. Yakuboff also purchased shares and has been assigned shares

of Gauzy traceable to the Defective Registration Statement. Such shares are traceable to the Defective Registration Statement because they were purchased during the lock-up period following the IPO, and also within the first ninety (90) days of trading.

18. Lead Plaintiff Troy Morrison ("Morrison"), as set forth in the certification accompanying his Motion for Appointment as Lead Plaintiff (ECF No. 11-2), purchased Gauzy common stock during the Exchange Act Class Period and was damaged upon the revelation of the alleged corrective disclosures.

19. Defendant Gauzy is an Israeli Corporation with principal executive offices located at 14 Hathiya Street, Tel Aviv – Yafo, Israel 6816914. Gauzy's securities trade on the NASDAQ stock exchange under the ticker symbol "GAUZ."

20. Defendant Eyal Peso ("Peso") is Gauzy's CEO and Chairman of the Company's Board of Directors, and served in those positions at all relevant times. Peso signed Gauzy's Defective Registration Statement and its Annual Reports filed with the SEC on Form 20-F, a "short-form" registration statement on Form F-3, as well as Reports of Foreign Private Issuer on Form 6-K. The Company's Defective Registration Statement designates Defendant Peso as the Chief Operating Decision Maker of Gauzy, and affirmed that he "reviews the financial information based on Gauzy and Vision's individual financial statements, accompanied by disaggregated information about revenues and gross profit to make decisions about resources to be allocated to the segments and assess their performance." Peso participated in the drafting of the Defective Registration Statement and had the opportunity to review that statement before filing and to withhold signature until misleading statements and omissions were corrected, and therefore could have prevented the misleading statements and omissions in the Defective Registration Statement.

21. Defendant Meir Peleg ("Peleg") is Gauzy's CFO, and served in that position during all relevant times. Peleg signed Gauzy's Defective Registration Statement, a "short-form" registration statement filed with the SEC on Form F-3, as well as Certifications pursuant to Exchange Act Rule 13a-14(a) or 15d-14(a) and 18 U.S.C. §1350 in connection with Gauzy's Annual Reports filed with the SEC on Form 20-F. Peleg participated in the drafting of the Defective Registration Statement and had the opportunity to review that statement before filing and to withhold signature until misleading statements and omissions were corrected, and therefore could have prevented the misleading statements and omissions in the Defective Registration Statement.

22. Defendant Michael Donnelly ("Donnelly") was a Director of Gauzy, and consented to being designated a director in the Defective Registration Statement. Donnelly signed Gauzy's Defective Registration Statement through his attorney-in-fact, Eyal Peso. Donnelly had the opportunity to review the Defective Registration Statement before filing and to withhold signature or consent to be named as a director therein until misleading statements and omissions were corrected, and therefore could have prevented the misleading statements and omissions in the Defective Registration Statement.

23. Defendant Gal Gitter ("Gitter") was a Director of Gauzy, and consented to being designated a director in the Defective Registration Statement. Gitter signed Gauzy's Defective Registration Statement through his attorney-in-fact, Eyal Peso. Gitter had the opportunity to review the Defective Registration Statement before filing and to withhold signature or consent to be named as a director therein until misleading statements and omissions were corrected, and therefore could have prevented the misleading statements and omissions in the Defective Registration Statement.

24. Defendant Alexander Babitsky ("Babitsky") was a Director of Gauzy, and consented to being designated a director in the Defective Registration Statement. Babitsky signed Gauzy's Defective Registration Statement through his attorney-in-fact, Eyal Peso. Babitsky had the opportunity to review the Defective Registration Statement before filing and to withhold signature or consent to be named as a director therein until misleading statements and omissions were corrected, and therefore could have prevented the misleading statements and omissions in the Defective Registration Statement.

25. Defendant Danny Allouche ("Allouche") was a Director of Gauzy, and consented to being designated a director in the Defective Registration Statement. Allouche signed Gauzy's Defective Registration Statement through his attorney-in-fact, Eyal Peso. Allouche had the opportunity to review the Defective Registration Statement before filing and to withhold signature or consent to be named as a director therein until misleading statements and omissions were corrected, and therefore could have prevented the misleading statements and omissions in the Defective Registration Statement.

26. Defendant Ezriel Jesse Klein ("Klein") was a Director of Gauzy, and consented to being designated a director in the Defective Registration Statement. Klein signed Gauzy's Defective Registration Statement through his attorney-in-fact, Eyal Peso. Klein had the opportunity to review the Defective Registration Statement before filing and to withhold signature or consent to be named as a director therein until misleading statements and omissions were corrected, and therefore could have prevented the misleading statements and omissions in the Defective Registration Statement.

27. Defendant Barclays Capital Inc. ("Barclays") was the lead underwriter of the IPO and was identified as an underwriter in the Defective Registration Statement.

28. Defendant TD Securities (USA) LLC ("TD Securities") was an underwriter of the IPO and was identified as an underwriter in the Defective Registration Statement.

29. Defendant Stifel, Nicolaus & Company Incorporated ("Stifel") was an underwriter of the IPO and was identified as an underwriter in the Defective Registration Statement.

30. Defendant B. Riley Securities, Inc. ("B. Riley") was an underwriter of the IPO and identified was as an underwriter in the Defective Registration Statement.

31. Defendant Beech Hill Securities, Inc. ("Beech Hill") was an underwriter of the IPO and was identified as an underwriter in the Defective Registration Statement.

32. Defendants Barclays, TD Securities, Stifel, B. Riley, and Beech Hill ("Underwriter Defendants") participated in the drafting and dissemination of the Defective Registration Statement for the IPO and failed to perform adequate due diligence in connection with their roles as underwriters. As a result, these Defendants were negligent in failing to ensure that the Defective Registration Statement was prepared accurately and in compliance with Section 11 of the Securities Act and Regulation S-K. These Defendants could have prevented the misleading statements and omissions in the Defective Registration Statement, including by declining to proceed with the IPO until the misleading statements and omissions were corrected.

33. The Underwriter Defendants participated in the drafting and dissemination of the Defective Registration Statement for the IPO and failed to perform adequate due diligence in connection with their roles as underwriters. As a result, the Underwriter Defendants were negligent in failing to ensure that the Defective Registration Statement for the IPO was prepared accurately and in accordance with the rules governing its preparation. Collectively, the Underwriter Defendants and their underwriting syndicate received underwriting discounts and commissions of approximately $3.3 million in connection with the IPO. The Underwriter Defendants' failure to conduct an

adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

34. Gauzy, Peso, Peleg, Donnelly, Gitter, Babitsky, Allouche, Klein, Barclays, TD Securities, Stifel, B. Riley and Beech Hill are sometimes referred to as the "Securities Act Defendants." Gauzy, Peso and Peleg are sometimes referred to as the "Exchange Act Defendants."

35. The Exchange Act Defendants possessed the power and authority to control the contents of Gauzy's SEC filings, press releases, and/or other market communications, and exercised that authority in the course of their day-to-day conduct. Because of their positions with Gauzy, their access to material information available to them but not to the public, and their day-to-day responsibilities, the Exchange Act Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the investing public, and that the representations being made were materially false and misleading and omitted to state material facts.

## THE CONFIDENTIAL WITNESSES

36. Confidential Witness #1 ("CW1") served as a C-level executive for Vision Systems from March 2016 to May 2024, and thereafter consulted with Vision Systems until August 2024. CW1 had overall responsibility for preparing Vision Systems' sales reports and budgets, attended and participated in meetings that discussed the financial problems of Gauzy and its subsidiaries. In connection with these responsibilities, CW1 reviewed, among other things, financial metrics, sales reports and budgets, customer orders, and expense reports. After Vision was acquired by Gauzy, CW1 regularly interacted with Peso and occasionally interacted with Peleg.

37. Confidential Witness #2 ("CW2") served as a Sales Manager and Sales Operations Manager for Gauzy from January 2021 to November 2025. In this position, CW2 prepared financial reports and financial forecasts for Gauzy's Americas Sales Director, Sales Vice

President, and Marketing Vice President, which CW2 was told were distributed by the Sales Directors and Vice Presidents of each segment to Peso and Peleg. CW2 attended meetings where Peso and Peleg discussed the Defendants' financial condition and sales financial figures. CW2 also attended quarterly and annual meetings where Gauzy's financial issues were discussed, as well as staff meetings, and had access to Defendants' Salesforce reporting systems.

## FACTS COMMON TO ALL CLAIMS

### A. Relevant Background

#### I. Overview of Gauzy and its Business

38. Headquartered in Israel, Gauzy operates in the markets of vision control and light control technologies. It designs, develops, manufactures, and sells products that change glass transparency as well as camera products that are retrofitted onto vehicles. Gauzy divides its customers into four segments: Architecture, Aeronautics, Automotive, and Safety Tech. Automotive covers automobile manufacturing customers. Architecture covers customers with window replacement needs. Safety Tech revolves around commercial vehicles and advanced driver assistance systems ("ADAS") technology for trucks. Aeronautics covers customers in the aviation sector. Gauzy claims to be a global leader in the light and vision control markets.

39. In 2017, Gauzy entered into a license agreement with Research Frontiers, Inc. ("Research Frontiers"), the creator of SPD technology, to allow Gauzy to use and sell films and other products incorporating SPD. But Gauzy lacked the "know-how" and production capabilities to produce SPD. Accordingly, Gauzy purchased and resold SPD film from Hitachi Chemical Company, Ltd. (now known as Resonac Corporation), another licensee of Research Frontiers. Unlike Gauzy, Hitachi had developed processes to reliably manufacture the SPD film. However, it charged very high prices.

40. Beginning in 2020, Gauzy completed a series of transactions aimed at growing its four segments. For example, in January 2022, Gauzy completed its transformative acquisition of Vision, which was a global leader in light control and camera-based products for aeronautics and automotive markets.

**II. Prior to its IPO, Gauzy Acquired Severely Distressed Vision Companies**

41. Created in 2013, Vision Lite acquired a series of French aeronautics and automotive companies. By 2021, Vision Lite wholly owned Vision Systems Corporate (later renamed Gauzy SAS) which, in turn, wholly owned Vision Systems, Safety Tech Co., and Vision Systems North America.

42. The Vision companies were crucial for Gauzy's Aeronautics and Safety Tech segments. Vision Systems primarily manufactured light control products for the Aeronautics Segment, while Safety Tech Co. primarily manufactured truck camera and driver-assist systems for the Automotive and Safety Tech segments. As early as 2021, CW1 and former Vision owner Carl Putman internally discussed Vision System's liquidity problems, and Carl Putman acknowledged that Vision Systems needed additional capital.

43. On February 27, 2021, Vision entered into a share purchase agreement with Gauzy contemplating Gauzy's acquisition of the Vision group of companies.

44. Although not publicly acknowledged by Gauzy, Vision and its subsidiaries had certain regulatory disclosure obligations in France. In particular, they were required to file with regulators annual reports that included audited financial statements, identified owned properties, summarized liquidity risks and other material risks the company faced, and included minutes from shareholder meetings. At the time of this FAC, the French filings were available in French language at https://annuaire-entreprises.data.gouv.fr/. Gauzy elected not to disclose those filings to U.S

investors and did not include those filings on the investor relations portion of its website. As a result, the French filings were not widely known to or readily obtainable by reasonably diligent U.S. investors. French Commercial Code Article L225-248[1] imposed additional disclosure requirements for companies facing insolvency. First, if based on losses recorded in financial statements, it appears that a French company's share capital (in the United States, sometimes called shareholders equity) fell below half of invested capital, the company must convene an extraordinary general meeting to either prepare for dissolution of the company, or to decide against dissolving the company despite the impaired equity. The determination must be filed with French regulators.

45. Vision's liquidity crisis and looming insolvency were well known internally before the acquisition. CW1 explained that Vision Systems was constantly trying to make ends meet and always had trouble with financials. CW1 also stated that former owner Carl Putman would prepare weekly reports of Vision System's financials that showed the company hemorrhaging money, which were distributed to unionized French Vision Systems employees per union rules. Vision System's upper management also accessed a financial dashboard that summarized the subsidiary's financial position and results.

46. On October 26, 2021, Vision Lite held an extraordinary general meeting and considered dissolution pursuant to Commercial Code Article L225-248 due to its lack of liquidity. The following day, on October 27, 2021, Vision Lite filed an annual report with French regulators in the French language disclosing that consolidated revenue was down 20% in 2020 and the company lost €1,051,853. On November 12, 2021, Vision Lite filed meeting minutes with French regulators indicating that it had decided against dissolution despite its eroding liquidity. The meeting minutes

[1] Published in the French language at https://www.legifrance.gouv.fr.

were certified by the Registrar of the Commercial Court of Lyon, with the annual report and meeting minutes available in French at the time this Amended Complaint was filed at https://annuaire-entreprises.data.gouv.fr.

47. During the same time, Vision Systems filed an annual report for Fiscal Year 2020 with French regulators on October 27, 2021, disclosing Vision Systems lost €3,360,298. Vision Systems' report warned that Vision's operations would liquidate by January 30, 2022, should Gauzy's acquisition fail. The report further explained that Gauzy had provided financial support since July 2021. The annual report was available in French at the time this Amended Complaint was filed at https://annuaire-entreprises.data.gouv.fr.

48. These issues were well known within Gauzy after its February 2022 acquisition of Vision. CW1 detailed meetings, attended by Gauzy's and Vision's upper management, including Peso and Peleg, where the liquidity crisis and looming insolvency were "discussed non-stop." For example, CW1 attended regular annual meetings in France where Vision and Gauzy executives reviewed period-to-date financial results. In one of these meetings in 2023, CW1 presented financial forecasts that included projections of both sales and operating expenses. CW1 also directly complained to Peso that, due to Vision's poor financial condition, Vision was unable to pay major vendors. Peso dismissed CW1's concerns and directed CW1 not to pay any bills and to just keep leveraging. Peso told CW1 that CW1 should not worry because no large company pays its vendors on time.

49. On February 8, 2022, Gauzy announced that it had closed the acquisition of the Vision group of companies, stating that with the acquisition, Gauzy would be a global leader in light-controlled glass (including SPD products).

50. On July 11, 2022, Vision Lite filed an annual report with French regulators in the French language disclosing that Vision Lite lost €872,356 in 2021. On July 12, 2022, Safety Tech Co. filed an annual report with French regulators in the French language disclosing €1,550,388 in losses for 2021. On the same day, Vision Systems reported to French regulators that its 2021 losses grew to €4,346,912, and Vision Systems Corporate reported to French regulators losses of €2,355,340 for 2021. These reports were available in French at the time this Amended Complaint was filed at https://annuaire-entreprises.data.gouv.fr.

51. On October 13, 2022, Gauzy confidentially filed a Draft Registration Statement with the SEC, which only was released publicly after the IPO. The Draft Registration Statement admitted that Vision had incurred significant losses from operations in the prior year, had a net capital deficiency and cash outflows from operating activities, and required additional financing and/or increased sales to stay afloat. This information was not contained in the Defective Registration Statement issued to investors.

52. In early 2023, Gauzy had 15 offices worldwide and 4 manufacturing sites in the United States, Israel, Germany, and France. According to the subsequently-filed Defective Registration Statement, Gauzy generated approximately "22.5% of [its] revenues in the United States, 21.7% in Europe (excluding France), 45.8% in France, 1.4% in Israel, and 4.6% in Asia, with the remaining 4.0% generated in other countries across the world. In the same period, [Gauzy] generated approximately 43.4% of [its] revenues in the aerospace market, 38.1% in safety tech and commercial vehicle market and 18.5% in the automotive market and architectural market combined."

53. Gauzy's crucial SPD business was still hampered by production defects. According to CW1, even after acquiring Vision, Gauzy still could not successfully produce SPD film. To

alleviate the worsening situation, Gauzy acquired Hitachi's SPD intellectual property portfolio "knowhow of [Hitachi's][2] technical and business information related to SPD film" in February 2023, as stated in Gauzy's Defective Registration Statement. CW1 confirmed that Gauzy still had problems producing SPD film at the time of its IPO.

54. On July 26, 2023, Vision Systems Corporate convened an extraordinary general meeting to consider dissolution pursuant to the French Commercial Code, but Vision Systems Corporate decided not to dissolve despite share capital falling below half of invested capital. On August 29, 2023, Vision Systems Corporate filed the meeting minutes with French regulators, which were available in French at the time this Amended Complaint was filed at https://annuaire-entreprises.data.gouv.fr.

55. Vision's French regulatory filings in the remainder of 2023 confirmed that Gauzy's acquisition of Vision did not stem losses in the Vision companies during Fiscal Year 2022 or cure their liquidity problems. On September 1, 2023, Vision Lite filed an annual report with French regulators in the French language disclosing €1,343,826 in losses for 2022, which increased retained losses from €2,656,939 to €4,000,765. Safety Tech Co. reported that its annual losses grew to €2,982,213 in 2022, and Vision Systems reported its annual losses of €1,490,064 in 2022. And Vision Systems Corporate announced 2022 losses of €3,913,835. These reports were available in French at the time this Amended Complaint was filed at https://annuaire-entreprises.data.gouv.fr.

56. On September 26, 2024, Vision Systems and Safety Tech Co. both convened extraordinary general meetings to consider dissolution pursuant to the French Commercial Code due to their lack of liquidity, but both decided not to not to dissolve. Vision Systems and Safety Tech Co. filed the

[2] Hitachi Chemical Corporation, the specific Hitachi entity from which the IP was purchased, was renamed Resonac. The two terms are used herein interchangeably.

minutes from these meetings with French regulators around October 1, 2024 and October 10, 2024, respectively. These minutes were available in French at the time this Amended Complaint was filed at https://annuaire-entreprises.data.gouv.fr.

57. On November 29, 2024, Vision Lite filed an annual report with French regulators in the French language disclosing that its 2023 losses grew to €11,742,336. On the same day, both Safety Tech Co. reported 2023 losses of €4,936,226 in its annual report, and Vision Systems Corporate reported 2023 losses of €3,006,481 in its annual report.

### III. Stalled Payments to Vendors and Employees

58. Even before Gauzy and its Vision subsidiaries went public, Vision failed to timely pay vendors. CW1 confirmed that it was well-known internally that Vision Systems was not timely paying its bills, and that Peso had advocated a strategy of delayed payment to maximize cash availability in the 2023 meeting described in Paragraph 48.

59. CW2 corroborated the late payment of vendors, and confirmed that the delay of payment created tension between Gauzy and many vendors. CW2, like CW1, regularly needed to appease frustrated vendors in the course of CW2's duties. CW2 explained that the excuses they gave for delayed payment were constantly rotating. During quarterly meetings in 2023 and 2024, attended by CW2 and Peso, CW2 said that Peso discussed the vendor non-payments and suggested it should be blamed on end customers who had not timely paid Gauzy.

60. Even after the IPO, CW2 observed Gauzy defaulting on payments to vendors. CW2 wondered how Gauzy could be in such financial distress after receiving the IPO money. CW1 corroborated that, after the IPO, money was not allocated to Vision Systems and vendors still went unpaid.

61. According to CW1, the former CFO of Visions Systems, Florence Giraud, kept reporting the financial problems at Vision Systems to Defendants Peleg and Peso. CW1 knows this because Giraud regularly met with CW1, and Giraud expressly relayed to CW1 that Peleg ordered Vision Systems not to pay back loans.

62. Gauzy's relationships with outside vendors were a core part of its French operations and U.S. operations. CW1 corroborated that Vision experienced difficulty obtaining parts from vendors to develop the products in France, because of the reputation that Gauzy could not pay its bills.

63. CW2, like CW1, confirmed that Gauzy's inability to timely pay vendors caused vendors to walk away. For example, in April 2025, Gauzy touted a light-control film installation project at Miami's Cruise Ship Terminal for Gauzy customer MSC Cruise. Peso was aware of this project and spoke about it personally in an April 14, 2025 press release. However, as CW2 confirmed, a project subcontractor placed a lien on MSC in late 2025 because Gauzy did not pay the subcontractor. Peso was also aware of this because, as CW2 confirmed, Peso had dinner with the subcontractor in Florida where the nonpayment was discussed. CW2 was aware of the nonpayment issues because CW2 was in charge of preparing weekly financial reports for Gauzy's U.S. companies and attended weekly meetings where every single U.S. project would be discussed, including project approvals, production timelines, and incoming customer payments. Gauzy's financial condition was so severely impaired that, by April 2025, Gauzy ceased payments to the IRS. Indeed, around April 2025, CW2 started seeing IRS letters demanding payment of unpaid taxes, including one IRS invoice for about $150,000.

## IV. Internally-Known French Labor Disputes

64. CW1 explained that, as part of the acquisition, Gauzy and Vision entered into a contract guaranteeing that French employees, including upper management, would be retained for at least two years. CW1 mentioned that Vision upper management wanted to ensure employees would be well taken care of and union rights respected for Vision's unionized French employees. CW1 knows this because CW1 regularly met with the rest of Vision's upper management, Carl Putnam, Florence Giraud, and Catherine Robin, and, post-acquisition, communicated with Gauzy leadership including frequently with Peso and occasionally with Peleg. Vision's upper management, moreover, expressly relayed concerns about Gauzy's treatment of French employees to CW1. CW2 confirmed that these concerns, as well as concerns about timely payment of U.S. employees, existed both before and after Gauzy's IPO.

65. For example, CW1 explained the French union rules mandated disclosure of the companies' financial status via weekly reports. But Gauzy stopped this mandated financial reporting after the acquisition.

66. In the months after the June 6, 2024 IPO, CW1 and Peso attended staff meetings where CW1 conveyed Vision's inability to timely make payroll. CW2 corroborates that Gauzy failed to pay its employees in a timely manner. CW2 elaborated that by April 2025, payroll distribution was delayed worldwide at Gauzy, and continued to be delayed through the remainder of 2025.

**B. Inflated Figures Were Included in Gauzy's Revenue Backlog**

67. Prior to the IPO and thereafter, Gauzy and its management had real-time access into sales trends because they tracked sales prospects globally using Salesforce software. This information was used to generate the financial reports and projections distributed internally, as set forth below, including sales quotas, pending customer balances, and sales performance metrics.

68. According to CW2, financial results and projections were prepared at the subsidiary level and reported weekly, quarterly and annually. CW2 was in charge of preparing these reports for Gauzy's U.S. businesses. CW2 elaborated that each subsidiary would send this financial information to the Vice President of each segment, who would then compile the information and transmit it to Gauzy's Israeli finance team, which compiled the data of all subsidiaries on a consolidated basis for financial reporting. CW2 and CW1 also confirmed that senior executives met on a quarterly and annual basis to review the Company's finances and projections. CW2 knows this because CW2 was charged with preparing the above reports, attended quarterly and annual meetings, and had access to Defendants' financial systems. CW1, as a C-level executive of Vision Systems, was likewise involved in Vision's finances and prepared its sales budgets.

69. However, in the months before the IPO, Defendants began including in backlog revenue orders for products that were not requested or in higher amounts than requested, or for specific performance obligations that had not yet occurred. CW1 confirmed that Gauzy would inflate Vision's sales budgets beyond actual commitments. For example, CW1 said, if Honda indicated it would make 25 planes in the coming year, Gauzy might double that indication in its sales budget. Gauzy would also budget sales for products that would take at least a year to design, and therefore could not produce sales in the coming year. Before becoming a part of Gauzy, CW1 indicated that Vision Systems would not count those as budgeted.

70. Sales budgets, which were rolled up into revenue backlog, also included non-existent customers. Defendant Peso told CW1 that CW1's division had to report a certain dollar amount of orders, even if it required predicting sales that were not final or were without signed contracts.

71. Gauzy also included in its backlog figures unrealized orders from customers that had canceled their Gauzy contracts or orders. For example, the electrical car company Lucid Inc. had

paid Gauzy to develop an SPD product for an upcoming vehicle but dropped the feature before the car went into production. According to CW1, Peso nonetheless indicated that Gauzy should consider that an order. And Gauzy executives refused to remove orders from contracts that were canceled or not realized despite the urging of CW1 and CW2, who both were involved in reporting sales for their respective units.

72. In a February 26, 2024 letter responding to an updated Draft Registration Statement, the SEC specifically asked Gauzy and Peso about what seemed to be an unusual leap in backlog revenue:

> We note the significant increase in your revenue backlog as of the nine months ended September 30, 2023. You define revenue backlog as booked orders based on purchase orders or hard commitments that have not been shipped yet or have been shipped but not yet recognized as revenue. To help us better understand your disclosure, please revise to disclose whether any of the hard commitments included in the estimated backlog have a duration longer than one year.

Both the February 26, 2024 letter and all versions of the Draft Registration Statement were kept confidential and not disclosed publicly until after the IPO.

## <u>FACTS ALLEGED WITH RESPECT TO SECURITIES ACT COUNTS</u>

### A. Defendants Use Materially False and Misleading Representations to Raise $75 Million from Public Investors

73. On April 15, 2024, Gauzy filed the Defective Registration Statement on Form F-1, and amended the Defective Registration Statement on May 20, 2024, May 29, 2024, and June 5, 2024. On June 5, 2024, the thrice-amended Defective Registration Statement was declared effective by the SEC. On June 6, 2024, pursuant to the Defective Registration Statement, Gauzy began publicly trading on the NASDAQ under the ticker symbol, “GAUZ.” On June 7, 2024, Gauzy announced that its IPO had raised approximately $75 million, less underwriting discounts, commissions, and other offering expenses by selling 4,411,765 shares of common stock at $17 per share.

74. The Defective Registration Statement directed investors to rely ***only*** on information contained therein:

> You should rely only on the information contained in this prospectus or in any related free-writing prospectus that we have authorized to be delivered or made available to you. Neither we nor the underwriters have authorized anyone to provide any information or to make any representations other than those contained in this prospectus, any amendment or supplement to this prospectus, or in any free writing prospectus prepared by us or on our behalf or to which we have referred you.[3]

75. Under a sub-heading entitled "Acquisitions," the Defective Registration Statement falsely characterized Gauzy's acquisition and integration of Vision Lite and its subsidiaries as "successful" and falsely touted an Intellectual Property acquisition as a "testament to [its] acquisition sourcing and execution capabilities":

> ***We have a proven track record with our successful acquisition and integration of Vision Lite in January 2022*** and intend to target opportunities that strengthen our market position, expand our product portfolio, enhance our technologies and extend our manufacturing capabilities, including through vertical integration. In February 2023, we completed an acquisition of Resonac's (formerly Hitachi Chemical) full SPD intellectual property portfolio and business, which included obtaining and learning the know-how with respect to Resonac's technical and business information related to such acquired patents, ***another testament to our acquisition sourcing and execution capabilities.***[4]

76. The statements identified in Paragraph 75 were materially false and misleading when made because: (a) the Vision acquisition was not "successful" but rather saddled Gauzy with insolvent companies that then threatened its own liquidity; (b) the Resonac IP acquisition was not the result of "acquisition sourcing and execution capabilities" but rather an existing vendor relationship; and (c) the statements omitted the following adverse information necessary to make them not

---

[3] While this language also refers to a "free-writing prospectus" that might be delivered, Gauzy did not deliver any "free-writing prospectus" to investors. A free-writing prospectus is a document such as a roadshow presentation or marketing brochure that presents certain information to investors during an IPO quiet period, and is filed with the SEC on Form FWP. Gauzy's SEC entry contains no filings under Form FWP.

[4] Unless otherwise stated, all emphasis in quoted material is supplied.

misleading under the circumstances in which they were made: (1) after acquiring Vision, Gauzy had itself suffered liquidity problems so severe that it had directed CW1 to stall paying vendors until the IPO, a practice which continued to occur after the IPO, *see* ¶¶48, 58-63; (2) rather than being successfully integrated, Vision Lite and its subsidiaries had labor problems which limited production; (3) Gauzy had failed to timely pay employees of the acquired companies on multiple occasions; and (4) the Resonac IP purchase was required because Gauzy, which had been licensed to manufacture Research Frontiers' SPD technology since 2017, had been unable to manufacture the product successfully and therefore had to use Hitachi (the parent of Resonac) to manufacture SPD film on its behalf.

77. Under a sub-heading entitled "Experienced Management Team With Strong Track Record of Driving Growth," Peso was lauded as having "***executed key strategic initiatives across the platform to drive accelerated growth and improved profitability***, including developing significant partnerships with industry-leading customers, investing in new technologies and products, upgrading operational capabilities and ***executing the transformational acquisition and integration of Vision Lite***."

78. The statements identified in Paragraph 77 were materially false and misleading when made because: (a) the primary strategic acquisition mentioned, the acquisition of Vision Lite and its subsidiaries, did not "improve[] profitability"; and (b) the statements omitted the following adverse information necessary to make them not misleading under the circumstances in which they were made: (1) after acquiring Vision, Gauzy had itself suffered liquidity problems so severe that it had directed CW1 to stall timely payments to vendors until the IPO, a practice which continued to occur after the IPO, *see* ¶¶48, 58-63; (2) rather than being successfully integrated, Vision Lite and

its subsidiaries had labor problems which limited production; and (3) Gauzy had failed to timely pay the employees of the Company because the Company had failed to meet payroll.

79. Under a sub-heading entitled "Human Capital Resources," the Defective Registration Statement mischaracterized Gauzy's employee relations:

> "Our key human capital management objectives are to attract, retain and develop the highest quality talent throughout our company. ***To support these objectives, we strive to provide our employees good working conditions and competitive pay***, as well as a wide range of benefits programs to eligible employees. We continuously evaluate our benefits programs and policies to meet present and future employee needs and desires.
>
> …
>
> At Gauzy, culture is not just an incidental by-product of working together, it's our way of life. We believe in integrity, inclusion, diversity, and fairness, as shown ***by the employee initiatives that we encourage and enforce***:
>
> - respectful communication and cooperation between all employees;
> - teamwork and employee participation, encouraging the representation of all groups and employee perspectives;
> - work/life balance through flexible work schedules to accommodate employees' varying needs; and
> - employer and employee contributions to our communities to promote a greater understanding and respect for diversity.
>
> …
>
> Approximately 42% of Vision Systems employees participate in local union elections and 100% are covered by collective bargaining agreements. ***We believe that we maintain good relations with all our employees***, but we do have an anonymous reporting system setup for employees to confidentially report concerns."

80. The statements identified in Paragraph 79 were materially false and misleading when made because Gauzy did not "maintain good relations with all [its] employees" and because the statements omitted that Gauzy and its Vision subsidiaries were then in labor disputes with French unions, and Gauzy had on multiple occasions been late paying its employees. *See* ¶¶64-66.

81. Under the "Risk Factors" sub-heading, the Defective Registration Statement mischaracterized acquisition risks as generic and hypothetical risks although they had already materialized:

> "In addition, ***acquisitions or joint ventures could result in significant increases in our outstanding indebtedness and debt service requirements*** or could involve the issuance of securities that would be dilutive to existing shareholders***. Incurring additional debt to fund an acquisition may result in higher debt service and a requirement to comply with additional financial and other covenants***, including potential restrictions on future acquisitions and distributions. Funding an acquisition with our existing cash would reduce our liquidity. The terms of our existing and future debt agreements and our market capitalization may limit the size and/or number of acquisitions we can pursue or our ability to enter into a joint venture."

82. The statements identified in Paragraph 81 were materially false and misleading when made because they omitted to disclose that Gauzy had already materially threatened its liquidity by acquiring the Vision group of companies, which were insolvent even before the acquisition.

83. The Defective Registration Statement further mischaracterized the risk of labor disputes in France as generic and hypothetical, when they had already materialized:

> "***In France, where our employees are generally represented by a union, although we believe that our relations with the labor union are good***, no assurances can be made that we will not experience conflicts with the labor union, other groups representing employees, or our employees in general, especially in the context of any future negotiations with the labor union. We can also make no assurance that future negotiations with the labor union will not result in a significant increase in our cost of labor."

84. The statements identified in Paragraph 83 were materially false and misleading because: (a) employment relations with the unions in France were not "good"; and (b) the statements omitted that Gauzy and its Vision subsidiaries were then in labor disputes with French unions. *See* ¶¶64-66.

85. The Defective Registration Statement further indicated that the Company considered "revenue backlog" to be a key business metric consisting of "booked orders based on purchase orders or ***hard commitments*** (having a duration of less than one year) that have not been shipped yet or have been shipped but not yet recognized as revenue." The Defective Registration Statement

claimed that Gauzy "enjoy[ed] revenue visibility" as a result of its revenue backlog and claimed that backlog to total $36.9 million as of the end of Q1 2024.

86. The statements identified in Paragraph 85 were materially false and misleading when made because they omitted the following information necessary to make the statements not misleading under the circumstances in which they were made: (a) that Gauzy management had inflated customer budgets to include sales without hard commitments and often without any commitments at all, for example by assuming in its sales budget that a customer with a history of ordering film for five planes per month would purchase film for ten or twenty planes per month, or by making up customers; (b) the inflated budgets were negligently included in revenue backlog; and (c) as a result, Gauzy's true realizable revenue backlog was considerably less than $36.9 million as of the end of Q1 2024. *See* ¶¶67-72.

87. The Defective Registration Statement attributed the majority of Gauzy's purchase of Vision to goodwill:

| | | |
|---|---|---|
| **Total identifiable net assets assumed** | | 15,929 |
| Goodwill | | 21,972 |
| **Total** | **$** | **37,901** |

It further asserted that the Company tested its goodwill for impairment at least "annually" and between annual periods "whenever events or changes in circumstances indicate that the carrying amount of a reporting unit may not be recoverable." Nevertheless, the Defective Registration Statement claimed that in 2023 "no such events occurred" that would provide for an interim goodwill impairment test, and that "[n]o impairment charges were recognized as of December 31, 2023."

88. The statements identified in Paragraph 87 above were materially false and misleading when made because: (a) indicators of impairment had occurred during 2023, including insolvency

of principal subsidiaries, ballooning losses at principal subsidiaries, and inability to timely pay vendors and employees, all of which indicated potential impairment and required an interim impairment analysis; and (b) the statements omitted that the deteriorated value of the acquired Vision companies did not support the recorded amount of goodwill and an impairment therefore should have been recognized. *See* ¶¶41-57.

89. With regard to litigation and regulatory proceedings, the Defective Registration Statement listed a single 2017 Florida patent lawsuit and stated: "Except as disclosed above, we have not been, and are not currently, a party to any material or pending litigation or regulatory proceedings that could have a material adverse effect on our business, operating results, financial condition or cash flows." That statement was materially false when made because the Vision subsidiaries, which at the time of the Defective Registration Statement were part of Gauzy, triggered a French legal obligation for the affected companies to consider dissolution and to publish the results of that consideration, which Vision Lite did in 2021, Vision Systems Corporate did in 2023, and Vision Systems and Safety Tech Co. did in 2024. *See* ¶¶41-57.

**B. The Defective Registration Statement Also Violated SEC Regulation S-K**

90. Gauzy's Defective Registration Statement filed with the SEC was subject to Item 303 of Regulation S-K, which, among other things, required disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing expenses." 17 C.F.R. §229.303(b)(2)(ii). Item 303 also requires companies to disclose events that are likely to "cause a material change in the relationship between costs and revenues." 17 C.F.R. §229.303(b)(2)(i)-(ii).

91. Item 105 of Regulation S-K also required Defendants to include in the Defective Registration Statement a "discussion of the most significant factors that make the offering

speculative or risky." 17 C.F.R. §229.503(c). Item 105's purpose is "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." Sec. Offering Reform, S.E.C. Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004). The discussion of risk factors must be specific to the particular company and its operations, and must explain how the risk affects the company and/or the securities being offered. Generic boilerplate attempts to disclose potential risks and shield oneself from liability—like here—do not tell investors how the specific risks could affect their investment. *See* Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

92. In violation of Item 303, Gauzy's Defective Registration Statement failed to disclose the known uncertainties and adverse trends associated with liquidity, and in particular the liquidity constraints and insolvency risks of Gauzy's Vision group of subsidiaries, as well as the fact that Gauzy's financial condition had deteriorated to the point that it was unable to timely pay its vendors and employees.

## **SECURITIES ACT CLASS ACTION ALLEGATIONS**

93. The Securities Act Class consists of all persons who purchased or otherwise acquired Gauzy's common stock pursuant to or traceable to the Company's Defective Registration Statement, the body of which was incorporated into the final prospectus. The Securities Act Class asserts claims under Sections 11 and 15 of the Securities Act. These claims are grounded in strict liability, and do not assert that any Securities Act Defendant acted with the intent to defraud. Excluded from the Securities Act Class are: Defendants, former and current officers, senior managers, and directors of Gauzy, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, related

entities, joint ventures, family members, legal representatives, heirs, successors or assigns of any of the above.

94. The members of the Securities Act Class are so numerous that joinder of all members is impracticable. While the exact number of Securities Act Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the Securities Act Class. Lead Plaintiffs base this belief on the fact that over 4.4 million shares were sold to investors in the IPO, and that Gauzy shares traceable to the Defective Registration Statement were actively traded on the NASDAQ during the lock-up period thereafter. Record owners and other members of the Class may be identified from records maintained by the Company, its transfer agent and brokers, and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

95. Common questions of law and fact exist as to all members of the Securities Act Class and predominate over any questions solely affecting individual members of the Securities Act Class. Among the questions of law and fact common to the Securities Act Class are:

a. Whether the Securities Act Defendants made inaccurate statements or made materially misleading statements that omitted material information in the Defective Registration Statement;
b. Whether those misrepresentation and omissions violated federal securities laws; and
c. Whether the Securities Act Defendants violated Regulation S-K by omitting material adverse information from the Defective Registration Statement in violation of Items 105 and 303 of Regulation S-K.

96. Lead Plaintiffs' claims are typical of the claims of the members of the Securities Act Class as all members of the Securities Act Class were similarly affected by Defendants' wrongful

conduct in violation of federal law, and all assert the same legal claims arising out of the same conduct.

97. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Securities Act Class. Lead Plaintiffs have no interests antagonistic to the Securities Act Class and have retained highly experienced counsel specializing in securities litigation.

98. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all claims is impracticable. Furthermore, as the damages suffered by individual Securities Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Securities Act Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action on behalf of the Securities Act Class.

## COUNT I

**(Against Defendants Gauzy, Peso, Peleg, Donnelly, Gitter, Babitsky, Allouche, Klein, Barclays, TD Securities, Stifel, B. Riley, and Beech Hill for Violations of Section 11 of the Securities Act)**

99. Lead Plaintiffs repeat and re-allege allegations 1-7, 13-34, and 36-98 as if fully set forth herein.

100. This Count is based on strict liability and does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

101. This Count is asserted against the Company and each Securities Act Defendant named herein for violations of Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Lead Plaintiffs and all members of the Class who purchased or otherwise acquired Gauzy's securities pursuant to or traceable to the Defective Registration Statement.

102. The Company is the issuer of the stock issued via the Defective Registration Statement. As such, the Company is strictly liable for each misleading statement contained therein, even for innocent misrepresentations.

103. Defendants Peso, Peleg, Donnelly, Gitter, Babitsky, Allouche, and Klein signed the Defective Registration Statement and/or consented to be identified as a director of Gauzy in the Defective Registration Statement. Therefore, each had the ability and obligation to make a reasonable investigation into the statements contained in the Defective Registration Statement to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, these Defendants could have prevented the misleading statements and omissions contained in the Defective Registration Statement, including both omissions rendering statements misleading and omissions in violation of Regulation S-K. Thus, each of these Defendants is liable to Lead Plaintiffs and the Securities Act Class.

104. Defendants Barclays, TD Securities, Stifel, B. Riley, and Beech Hill each served as an underwriter of the IPO and agreed to be identified as an underwriter in the Defective Registration Statement. The Underwriter Defendants each had the ability and obligation to make a reasonable investigation into the statements contained in the Defective Registration Statement to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, the Underwriter Defendants could have prevented the misleading statements and omissions contained in the Defective Registration Statement, including both omissions rendering statements misleading and omissions in violation of Regulation S-K. Thus, each of these Defendants is liable to Lead Plaintiffs and the Securities Act Class.

105. Lead Plaintiffs and other members of the Securities Act Class acquired Gauzy's securities without knowledge of the untruths and/or omissions alleged herein. Lead Plaintiffs and the other members of the Securities Act Class were thus damaged by Defendants' material misstatements and omissions.

106. This Action was brought within one year after the discovery of the untrue statements and omissions and within three years of the offering date.

**COUNT II**
**(Against Defendants Peso, Peleg, Donnelly, Gitter, Babitsky, Allouche, and Klein for Violations of Section 15 of the Securities Act)**

107. Lead Plaintiffs repeat and re-allege each and every allegation 1-7, 13-34, and 36-106 as if fully set forth herein.

108. This Count is asserted pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against Defendants Peso, Peleg, Donnelly, Gitter, Babitsky, Allouche, and Klein.

109. Defendants Peso, Peleg, Donnelly, Gitter, Babitsky, Allouche, and Klein were each control persons of Gauzy with respect to the Defective Registration Statement by virtue of their positions as signatories and/or directors. Defendants Peso, Peleg, Donnelly, Gitter, Babitsky, Allouche, and Klein had the power to influence, and did, in fact, exercise control over Gauzy, and caused it to issue a defective and misleading registration statement.

110. Defendants Peso, Peleg, Donnelly, Gitter, Babitsky, Allouche, and Klein directly participated in the control of Gauzy by having signed, or authorized the signing of, the Defective Registration Statement and authorizing the sale of Gauzy common stock to Lead Plaintiffs and other members of the Securities Act Class.

111. As control persons, Defendants Peso, Peleg, Donnelly, Gitter, Babitsky, Allouche, and Klein were involved with the day-to-day operations of Gauzy and were involved in reviewing and

describing Gauzy's operations and business prospects, including in the Defective Registration Statement. Each had the ability to control the contents of Gauzy statements therein, including by withholding signature until misstatements and omissions were corrected.

112. Lead Plaintiffs and other members of the Securities Act Class acquired Gauzy's securities without knowledge of the untruths and/or omissions alleged herein. Lead Plaintiffs and the other members of the Securities Act Class were thus damaged by the primary violations of the Company. By virtue of the conduct alleged herein, and their status as control persons of the Company, Defendants Peso, Peleg, Donnelly, Gitter, Babitsky, Allouche, and Klein are each secondarily liable to Lead Plaintiffs and the Securities Act Class for the primary violations of Gauzy.

## ADDITIONAL FACTS ALLEGED ONLY WITH RESPECT TO EXCHANGE ACT COUNTS

### A. Exchange Act Defendants Made Additional Materially Misleading Statements and Omissions in 2025

113. The Exchange Act Class Period begins on March 11, 2025. On that day, Gauzy submitted its annual report for the fiscal year ended December 31, 2024 on a Form 20-F filed with the SEC (the "FY 2024 20-F"), which was signed by Peso, and both Peso and Peleg personally certified pursuant to Exchange Act Rule 13a-14(a) or 15d-14(a) and 18 U.S.C. §1350 that the FY 2024 20-F "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

114. The FY 2024 20-F falsely assured investors of the Company's liquidity and capital resources, which it stated, "***will be sufficient to meet our anticipated cash requirements over at least the next 12 months***," as follows in relevant part:

**Liquidity and Capital Resources**

**Overview**

> … ***Based on our current business plan, we believe our current cash and cash equivalents, anticipated cash flow from operations and credit facilities, will be sufficient to meet our anticipated cash requirements over at least the next 12 months.*** We may need to raise additional capital before we can expect to become profitable from sales of our light and vision control products and may raise additional capital to expand our business, to pursue strategic investments, to take advantage of financing opportunities or for other reasons.

115. The statements identified in Paragraph 114 above were materially false and misleading when made because: (a) the Company's cash and cash equivalents, together with anticipated cash flow and cash flow from operations were not sufficient to meet cash requirements over at least the next 12 months; and (b) the statements omitted the following information necessary to make the statements not misleading under the circumstances in which they were made: (1) that the Vision subsidiaries it had just acquired were already insolvent and lacked the financial means to meet their obligations as they became due, including timely payment of vendors and employees; (2) as a result, insolvency proceedings in France were then foreseeable and likely; and (3) insolvency of the French subsidiaries would trigger cross-defaults under the Company's senior debt facilities.

116. The FY 2024 20-F also mischaracterized the risk of default as purely hypothetical:

> Our inability to generate sufficient cash flows to satisfy our debt obligations, or to refinance our indebtedness on commercially reasonable terms or at all, would have a material adverse effect on our financial condition and results of operations. ***If we cannot make scheduled payments on our debt, we will be in default, and the lenders under our credit facilities could terminate their commitments to loan money, the lenders could foreclose against the assets securing their borrowings and we could be forced into bankruptcy or liquidation***.

117. The statements identified in Paragraph 116 above were materially false and misleading when made because: (a) the Vision subsidiaries were already in default; and (b) the statements omitted the following information necessary to make the statements not misleading under the circumstances in which they were made: (1) the Vision subsidiaries had been insolvent since

approximately 2021; (2) as a result, insolvency proceedings in France were then foreseeable and likely; and (3) insolvency of the French subsidiaries would trigger cross-defaults under the Company's senior debt facilities.

118. With respect to goodwill impairment, the FY 2024 20-F stated that Gauzy's policy was to "test[] its goodwill for impairment every calendar year end" and that "[n]o impairment charges were recognized as of December 31, 2024." These statements were materially false when made because they omitted: (a) that the Company's largest and most important subsidiaries were in fact insolvent as of December 31, 2024; (b) that insolvency also would trigger a default in the Company's senior debt facilities; and (c) as a result of (a) and (b), the affected goodwill was impaired and an impairment should have been recognized.

119. On May 6, 2025, a French staffing agency issued formal notice to Vision Systems that Vision Systems had breached several October 3, 2024 contracts due to non-payment of invoices. It alleged that Vision Systems failed to pay approximately €30,000 from invoices dated November 30, 2024, December 31, 2024, January 31, 2025, and February 28, 2025.

120. The truth first began to partially emerge on May 13, 2025, when, during post-market hours, Gauzy issued a press release reporting its financial results for Q1 2025, filed with the SEC on Form 6-K. Among other results, Gauzy reported revenue of $22.4 million for the quarter, down $2.3 million from the previous year's first quarter. Defendants attributed the shortfall to shipment timing and "modest decline" in its Aeronautics and Architecture segments. The Aeronautics segment revenue dropped 24.6% to $7.6 million when compared to the $10.1 million in the prior year quarter. Aeronautics gross profit fell to $2.6 million from $4.5 million in the prior year quarter, amounting to a 42.1% drop in gross profit. Defendants, in response to specific questions by trained financial analysts during its May 13, 2025 investors call, repeatedly denied and

downplayed the scope of the challenges facing Gauzy by citing its backlog orders and tried to assure investors of its full-year guidance for 2025.

121. The shortfall in these segments, which were dominated by the insolvent Vision group of subsidiaries, was a partial materialization of the concealed risks and began to partially inform investors of problems in those subsidiaries not previously disclosed. On this news, Gauzy's stock price fell over 8% from its previous day's closing price of $9.71 to close at $8.96 on May 13, 2025. The price of Gauzy's common stock declined the following days, closing at $8.80 on May 14, 2025, and $8.58 on May 15, 2025's closing. The Exchange Act Defendants prevented a more severe decline by withholding the full truth and by making additional misrepresentations concealing liquidity and solvency problems.

122. On May 13, 2025, Gauzy filed a Form 6-K that covered Gauzy's Q1 2025 financial period as of March 31, 2025. Gauzy continued ensuring the investment community of Gauzy's liquidity and capital resources, as follows in relevant part:

> **Liquidity and Capital Resources**
>
> ***Overview***
>
> ***Based on our current business plan, we believe our current cash and cash equivalents, anticipated cash flow from operations and credit facilities, will be sufficient to meet our anticipated cash requirements over at least the next 12 months.*** We may need to raise additional capital before we can expect to become profitable from sales of our light and vision control products and may raise additional capital to expand our business, to pursue strategic investments, to take advantage of financing opportunities or for other reasons.

123. The statements identified in Paragraph 122 were materially false and misleading when made because: (a) the Company's cash and cash equivalents, together with anticipated cash flow and cash flow from operations were not sufficient to meet cash requirements over at least the next 12 months; and (b) the statements omitted the following information necessary to make the

statements not misleading under the circumstances in which they were made: (1) that the Vision subsidiaries it had acquired were already insolvent and lacked the financial means to meet their obligations as they became due, including timely payment of vendors and employees; (2) as a result, insolvency proceedings in France were then foreseeable and likely; and (3) insolvency of the Vision subsidiaries would trigger cross-defaults under the Company's senior debt facilities.

124. The May 13, 2025 Form 6-K also stated that Gauzy's goodwill impairment policy was to "perform an impairment test annually and whenever events or changes in circumstances indicate that the carrying amount of a reporting unit may not be recoverable." These statements were materially false when made because they omitted: (a) that the Company's largest and most important subsidiaries were in fact then insolvent; (b) that default would be triggered in the Company's senior debt facilities upon the acknowledgment of that insolvency; and (c) as a result of (a) and (b), the affected goodwill was impaired and an impairment should have been recognized.

125. On June 17, 2025, a third-party vendor filed suit in French court against Safety Tech Co. to recover €78,583.20 of unpaid contractual obligations. A copy of the lawsuit was available at the time this Amended Complaint was filed in the French language at https://www.justice.gouv.fr/documentation/open-data-court-decisions.

126. On July 3, 2025, Gauzy filed with the SEC a "short-form" registration statement on Form F-3 to register an indefinite number of securities for sale in one or more offerings in an amount not to exceed $150 million. The Form F-3 was signed by Peso and Peleg, and showed investors that Gauzy needed to raise additional cash, a symptom of the concealed insolvency. This revelation undermined Defendants' earlier false statements assuring investors that Gauzy had sufficient liquidity for the coming 12 months.

127. On this news, Gauzy's stock price fell from its previous day's closing price of $7.82 to close at $7.49 on July 3, 2025. The price of Gauzy's common stock declined the following days, closing at $7.12 on July 7, 2025; and $6.88 on July 8, 2025; and dropping precipitously to $5.74 on July 9, 2025's closing. A steeper decline was avoided because the Form F-3 did not disclose the full truth about known liquidity and solvency problems.

128. On August 13, 2025, Gauzy filed a press release on Form 6-K reporting the financial results for Gauzy's Q2 2025 financial period ending June 30, 2025. This Form 6-K operated as a partial corrective event, as the concealed risks partially materialized and the effects of the concealed risks were reported in the form of a substantial drop in revenue and margin. Gauzy was forced to disclose that revenue had lowered to $20.1 million from $24.4 million when compared to the second quarter of Fiscal Year 2024, and its Aeronautics division sustained heavy drops in revenue, a 31.7% drop from $10 million to $6.9 million. Gross profit margin was down 5.6%, from 27.0% to 21.4%, from the prior year quarter.

129. On this news, Gauzy's stock price fell from its previous day's closing price of $6.46 to close at $6.10 on August 13, 2025.

130. To prevent a further drop, Gauzy and the other Exchange Act Defendants concealed the mounting payment disputes and liquidity problems, repeating verbatim in the Form 6-K the same liquidity misstatements they had made previously:

> **Liquidity and Capital Resources**
>
> ***Overview***
>
> ***. . . Based on our current business plan, we believe our current cash and cash equivalents, anticipated cash flow from operations and credit facilities, will be sufficient to meet our anticipated cash requirements over at least the next 12 months.*** We may need to raise additional capital before we can expect to become profitable from sales of our light and vision control products and may raise

> additional capital to expand our business, to pursue strategic investments, to take advantage of financing opportunities or for other reasons.

131. The statements identified in Paragraph 130 were materially false and misleading when made because: (a) the Company's cash and cash equivalents, together with anticipated cash flow and cash flow from operations were not sufficient to meet cash requirements over at least the next 12 months; and (b) the statements omitted the following information necessary to make the statements not misleading under the circumstances in which they were made: (1) that the Vision subsidiaries it had acquired were already insolvent and lacked the financial means to meet their obligations as they became due, including timely payment of vendors and employees; (2) as a result, insolvency proceedings in France were then foreseeable and likely; and (3) insolvency of the Vision subsidiaries would trigger cross-defaults under the Company's senior debt facilities.

132. The August 13, 2025 Form 6-K also repeated Gauzy's goodwill impairment policy: "We perform an impairment test annually and whenever events or changes in circumstances indicate that the carrying amount of a reporting unit may not be recoverable." These statements were materially false when made because they omitted: (a) that the Company's largest and most important subsidiaries were in fact insolvent as of December 31, 2024; (b) that default would be triggered in the Company's senior debt facilities upon the acknowledgment of that insolvency; and (c) that as a result of (a) and (b), the affected goodwill was impaired and an impairment should have been recognized.

133. On September 17, 2025, the French court hearing the suit against Safety Tech Co. for nonpayment (*see* ¶125) issued a decision against Safety Tech Co., ordering Safety Tech Co. to pay its entire debt. The decisions were available in French at the time this Amended Complaint was filed at https://www.justice.gouv.fr/documentation/open-data-court-decisions.

134. On September 22, 2025, the French staffing agency that had issued a demand to Vision Systems for nonpayment in May 2025 (*see* ¶119) filed suit in French court. On October 21, 2025, the French court rendered a decision against Vision Systems, finding that uncontested documents proved that the debt was not contestable or subject to dispute. A copy of the decision was available in French at the time this Amended Complaint was filed at https://www.justice.gouv.fr /documentation/open-data-court-decisions.

135. Two French real estate companies separately filed lawsuits on (a) October 14, 2025 against Vision Systems, and (b) on November 12, 2025 against Vision Lite. The suits were available in French at the time this Amended Complaint was filed at https://www.justice.gouv. fr/documentation/open-data-court-decisions.

136. According to CW1, five former employees have also filed suits against Vision for violations of employment contract provisions and French labor laws. Two of the former employees are EVP Catherine Robin and EVP Jerome Monvallier. CW1 knows this because Vision's upper management regularly conveyed employment issues to CW1 during CW1's time with Vision Systems, and because CW1 maintained communications with former upper management of Vision Systems after CW1's departure from Vision Systems.

137. On November 14, 2025, Gauzy admitted in a press release that a French court had "ordered the commencement of French law insolvency proceedings ("Redressement Judiciaire") relating to three subsidiaries of Gauzy located in France." According to Gauzy's press release, "Redressement Judiciaire are French insolvency proceedings aimed at preserving a company's business and operations, maintaining employment and repaying creditors while allowing for a plan to enable its recovery." The Company further revealed the "commencement of these insolvency proceedings in

France constitutes a default under the Company's existing senior secured debt facilities, which if not remedied could lead to an event of default."

138. On this news, Gauzy's share price fell $2.00 per share, or 49.8%, over two consecutive trading days, to close at $2.02 per share on November 17, 2025, on unusually heavy trading volume.

139. As a result of the Exchange Act Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and other Exchange Act Class members have suffered significant losses and damages. The damages suffered by Lead Plaintiffs and other members of the Exchange Act class were directly and proximately caused by the Exchange Act Defendants' wrongful conduct as alleged herein.

## ADDITIONAL FACTS PROBATIVE OF SCIENTER

### A. Post-Class Period Admissions and Developments

140. Post-Class Period events and Defendants' own admissions after the Class Period bolster an inference of fraud and corroborated the CWs' accounts.

141. On January 6, 2026, the French courts issued three judicial decisions: (1) January 6, 2026 Lyon Economic Activities Tribunal RG No. 2025F06408; (2) January 6, 2026 Lyon Economic Activities Tribunal RG No. 2025F06409; and (3) January 6, 2026 Lyon Economic Activities Tribunal RG No. 2025F06410. The decisions were available in French at the time this Amended Complaint was filed at https://www.justice.gouv.fr/documentation/open-data-court-decisions. These three judicial opinions revealed what Defendants had concealed throughout the Exchange Act Class Period: "[A]t the opening of the [November 13, 2025] proceedings, the cash flow of the Group's companies was drained, production stopped, whilst the rights of employees were not secured and the occupancy of the premises was threatened by a condition subsequent invoked by the parent company, with risk of termination of the insurance policies for industrial activities. They

add that cash flow was nil and invoice finance was unavailable due to termination by the factor (factoring company)." Defendants did not contest these factual findings at the insolvency proceedings.

142. The French courts confirmed in the aforementioned decisions that Defendants had failed to restart production at Vision: "To date, despite the efforts deployed, they relate that the return to production has not yet materialized" since November 13, 2025.

143. In the same vein, the French courts credited testimony from an "employee representative" of Vision that "production is stopped due to lack of parts, that they have difficulty communicating with management, and that they have a strategic vision problem."

144. On March 6, 2026, as part of the French insolvency proceedings, Gauzy began to publicly look for buyers for Vision, indicating that Vision's financial woes had no end in sight.

145. On March 17, 2026, a French court issued a judicial decision titled "March 17, 2026 Nanterre Economic Activities Tribunal RG No. 2026R00266" against Vision Lite for failing to pay a vendor for equipment contracts entered into around November 28, 2024, December 28, 2024, and March 18, 2025. The French court concluded that Vision Lite had not paid an undisputed debt, and deemed the equipment contracts terminated from January 22, 2026. Moreover, Vision Lite was ordered to pay close to €150,000 and was ordered to return the rented equipment. The decision was available in French at the time this Amended Complaint was filed at https://www.justice.gouv .fr/documentation/open-data-court-decisions.

146. On April 8, 2026, Gauzy filed a Form 6-K entitled "Application by Certain Employees for Order for Commencement of Proceedings in Israel" where Defendants revealed that about 24 former and current Israeli employees filed a suit to commence Israeli insolvency proceedings against Gauzy. These insolvency proceedings are ongoing as of the date of this filing.

147. On April 30, 2026, Gauzy filed an NT 20-F on Form 12b-25 indicating that Gauzy would not timely file its Form 20-F. In the Form 12b-25, Gauzy made damning admissions that substantively corroborate the CW accounts from before and during the Class Periods, and entirely contradicted Defendants' 2025 assertions that the Company was liquid and its goodwill unimpaired:

> The delay is primarily attributable to the additional time required to complete the review and disclosure of recent material developments affecting the Registrant and certain of its subsidiaries. These developments include, among other matters, ***insolvency and restructuring-related proceedings involving certain of the Registrant's French subsidiaries, a public sale process relating to certain French operations, ongoing liquidity constraints, an insolvency-related petition filed in Israel, and related legal, operational and financial matters***. The Registrant is evaluating the impact of these matters on the Annual Report, including the financial statements, going concern analysis, risk factors, liquidity disclosure, subsequent events disclosure, legal proceedings disclosure, and other related disclosures.
>
> …
>
> The Registrant anticipates that the results of operations to be included in the Annual Report for the fiscal year ended December 31, 2025, will reflect significant changes from the results of operations for the fiscal year ended December 31, 2024.
>
> Based on information currently available to the Registrant, the Registrant expects such changes to include, among other things, ***lower revenues and increased indebtedness and other outstanding obligations as compared to the last fiscal year***. These ***anticipated changes are primarily attributable to the material developments*** described in Part III above, including ***ongoing liquidity constraints, insolvency and restructuring-related proceedings involving certain French subsidiaries of the Registrant, a sale process relating to certain French operations, an insolvency-related petition filed in Israel, related legal and creditor matters, and operational disruptions affecting the Registrant's business, including production delays and customer order delays or cancellations***.
>
> The Registrant currently expects revenue for the fiscal year ended December 31, 2025 to be approximately $68.3 million, compared to revenue of $103.5 million for the fiscal year ended December 31, 2024, representing a decrease of approximately 34 %. The Registrant currently expects operating loss from continuing operations for the fiscal year ended December 31, 2025 to be approximately $50.3, compared to $30.8 for the fiscal year ended December 31, 2024. The Registrant currently expects gross margin for the fiscal year ended December 31, 2025 to be approximately $14 / 20.6%, compared to $29.7 / 28.73% for the fiscal year ended December 31, 2024.

### B. The Core Operations Doctrine Bolsters an Inference of Scienter

148. Gauzy derives substantially most of its revenues in the Aeronautics and Safety Tech segments, which are the core segments that Vision served and that were deeply insolvent during the Exchange Act Class Period. As such the core operations doctrine can be invoked to support scienter because Vision's operations touched on Gauzy's entire business and the problems with Vision did ultimately impact the Company's bottom line as alleged elsewhere herein.

### C. Suspiciously Timed Resignations During the Exchange Act Class Period and Shortly Thereafter Strengthen the Inference of Scienter

149. On August 7, 2025, on a Form 6-K, Gauzy announced that Allouche resigned from Gauzy's Board of Directors, falsely claiming that the resignation was "for personal reasons and not due to any disagreement with the Company on any matter relating to its operations, policies or practices."

150. On August 8, 2025, Gauzy issued a press release announcing Gitter's resignation from the board following his "expiration as a Class I director."

151. On September 16, 2025, in a press release filed with the SEC on Form 6-K, Gauzy announced the resignation of Donnelly, again falsely claiming that the resignation was "solely for personal reasons."

152. By December 3, 2025, Gauzy was in violation of NASDAQ's director independence rules as stated in Gauzy's Form 6-K and December 2, 2025 press release: "The Company's audit committee is no longer in compliance with Nasdaq Listing Rule 5605(c)(2)(A), which requires listed companies to maintain an audit committee consisting of at least three independent directors as the Company's Board is now comprised of only three members, one of whom, Eyal Peso, the Company's chairman and chief executive officer, is not independent." This non-compliance was triggered by the additional resignations of Klein and Alejandro Weinstein on December 2, 2025.

Mr. Weinstein had been a Board Member for just one month, having publicly stated on August 8, 2025 that he joined Gauzy's Board with a November 1, 2025 start date.

153. On January 26, 2026, Gauzy issued a press release filed with the SEC on Form 6-K, where Gauzy disclosed that Peleg was stepping down from his CFO role at Gauzy.

154. Tucked into the January 26, 2026 press release was disclosure of two more director resignations: Lilach Payorski and Alexander Babitsky.

155. On February 6, 2026, Defendants issued a press release filed with the SEC on Form 6-K, where defendants disclosed non-compliance with "Nasdaq's continued listing requirements related to board and committee independence under Nasdaq Listing Rules 5605(b)(1), 5605(c)(2), and 5605(d)(2)" due to "recent resignations of two members of the Company's Board of Directors."

156. The sudden and near-contemporaneous departures of Peleg, Allouche, Gitter, Donnelly, Klein, Babitsky, Lilach Payorski, and Alejandro Weinstein are highly suspicious and further evidence of scienter, as they occurred at a time when Gauzy repeatedly concealed or attempted to conceal its liquidity problems and the insolvency of its primary group of subsidiaries. The resignations coincided with mounting public evidence that Gauzy and its executives had concealed massive insolvency at Gauzy's primary subsidiaries, and it is highly unlikely that these eight individuals had decided at approximately the same time to resign "solely for personal reasons."

## EXCHANGE ACT CLASS ACTION ALLEGATIONS

157. The Exchange Act Class consists of all persons who purchased or otherwise acquired Gauzy's common stock between March 11, 2025, and November 13, 2025, both dates inclusive. The Exchange Act Class asserts claims under Sections 10(b) and 20(a) of the Exchange Act, and SEC 10b-5 promulgated thereunder. Excluded from the Class are: Defendants, former and current officers, senior managers, and directors of Gauzy, any entity in which any of the Defendants (alone

or in combination with other Defendants) have or had a controlling interest, and any affiliates, related entities, joint ventures, family members, legal representatives, heirs, successors or assigns of any of the above.

158. The members of the Exchange Act Class are so numerous that joinder of all members is impracticable. Additionally, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members for the Exchange Act Class is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds of members in the Exchange Act Class. Record owners and other members of the Exchange Act Class may be identified from records maintained by the Company, its transfer agent and brokers, and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

159. Common questions of law and fact exist as to all members of the Exchange Act Class and predominate over any questions solely affecting individual members of the Exchange Act Class. Among the questions of law and fact common to the Exchange Act Class are:

a. Whether the Exchange Act Defendants' misrepresentations and omissions violated federal securities laws;
b. Whether the Exchange Act Defendants' misrepresentations and omissions were material;
c. Whether the Exchange Act Defendants made misrepresentations and omissions to investors during the Exchange Act Class Period;
d. Whether the Exchange Act Defendants acted with scienter;
e. Whether the prices of Gauzy's securities during the Exchange Act Class Period were artificially inflated because of the Exchange Act Defendants' conduct complained of herein; and
f. Whether the members of the Exchange Act Class have sustained damages and, if so, what is the proper measure of damages.

160. Lead Plaintiffs' claims are typical of the claims of the members of the Exchange Act Class as all members of the Exchange Act Class were similarly affected by Defendants' wrongful conduct in violation of federal law, and all assert the same legal claims arising out of the same conduct.

161. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Exchange Act Class. Lead Plaintiffs have no interests antagonistic to the Exchange Act Class and have retained highly experienced counsel specializing in securities litigation.

162. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all claims is impracticable. Furthermore, as the damages suffered by many individual Exchange Act Class members may be relatively small, the expense and burden of individual litigation make it impossible to individually redress the wrongs suffered. There will be no difficulty in the management of this Action as a class action.

163. For the Exchange Act Class, Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. During the Exchange Act Class Period, Defendants made public misrepresentations of material fact and failed to disclose material facts necessary to make the statements they publicly made during the Exchange Act Class Period not misleading under the circumstances in which they were made;
b. Gauzy's shares traded in an efficient market;
c. Gauzy's shares were liquid and traded with heavy volume during the Exchange Act Class Period;
d. Gauzy's shares traded on the NASDAQ, and the Company was covered by multiple analysts, journalists, and industry commentators;
e. The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities Lead Plaintiffs and members of the Exchange Act Class purchased, acquired and/or sold Gauzy's shares

between the time the Exchange Act Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts;

f. The market for Gauzy common stock was open, well-developed and efficient at all relevant times. As a result of the Exchange Act Defendants' materially false and misleading statements, Gauzy common stock traded at artificially inflated prices during the relevant period. The artificial inflation dissipated as the market learned of the nature and extent of the Exchange Act Defendants' misrepresentations; and

g. Based upon the foregoing, Lead Plaintiffs and the members of the Exchange Act Class are entitled to a presumption of reliance upon the integrity of the market.

164. Alternatively, Lead Plaintiffs and the members of the Exchange Act Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as the Exchange Act claims sound primarily in the omission of material information from their Exchange Act Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT III**
**(Against Defendants Gauzy, Peso, and Peleg for Violations of Section 10(b) of the Exchange Act and Rule 10b-5)**

165. Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein except the allegations setting forth misrepresentations in the offering documents identified in Paragraphs 73 through 92.

166. During the Exchange Act Class Period, the Exchange Act Defendants (Gauzy, Peso, and Peleg), individually and in concert, directly or indirectly, (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's

securities in an effort to maintain artificially high market prices for the Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

167. The Exchange Act Defendants acted with scienter in that they: knew or deliberately disregarded that the public statements made during the Exchange Act Class Period were materially false and/or misleading; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements as primary violations of the securities laws. The Exchange Act Defendants, by virtue of their knowledge and receipt of information reflecting the true facts of the Company, their control over the Company's materially misleading statements, and their associations with the Company, were privy to confidential proprietary information concerning the Company and participated in the fraudulent scheme alleged herein.

168. The Exchange Act Defendants had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and during the Exchange Act Class Period intended to be deceitful, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company personnel.

169. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Exchange Act Class Period. Lead Plaintiffs and the other members of the Exchange Act Class relied on the statements described above and/or the integrity of the market price of Company securities during the Exchange Act Class Period in purchasing Company securities at prices that were artificially inflated as a result of these Defendants' false and misleading statements.

170. Had Lead Plaintiffs and the other members of the Exchange Act Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Company securities at the artificially inflated prices that they did, or at all.

171. As a result of the wrongful conduct alleged herein, Lead Plaintiffs and other members of the Exchange Act Class have suffered damages in an amount to be established at trial.

172. By reason of the foregoing, the Exchange Act Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Lead Plaintiffs and other members of the Exchange Act Class for substantial damages which they suffered in connection with their purchase of Company securities during the Exchange Act Class Period.

**COUNT IV**
**(Against Defendants Peso and Peleg for Violations of Section 20(a) of the Exchange Act)**

173. Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein except the allegations related only to the Securities Act claims identified in Paragraphs 73 through 92.

174. During the Exchange Act Class Period, CEO Peso and CFO Peleg exercised control over the day-to-day activities of the Company, including the description to investors of Gauzy's operations, material trends, and operating environment. Because of their roles and responsibilities at Gauzy, Peso and Peleg knew the adverse non-public information concealed by Gauzy in the Exchange Act Class Period, and each had the authority and capability to control the contents of the misleading statements made as alleged herein.

175. As control persons of a publicly owned company, Peso and Peleg each had a duty to disseminate accurate and truthful information, and to promptly correct any public statements issued by Gauzy which had become materially false and/or misleading.

176. By virtue of their positions and their power to control public statements about Gauzy, Peso and Peleg had the power and ability to control the actions of Gauzy and its employees. By reason of such conduct, Pesos and Peleg are liable pursuant to Section 20(a) of the Exchange Act for the primary violations of Gauzy.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A. Certifying the instant Action as a class action under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Plaintiffs as Class Representatives;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other members of the Securities Act Class and Exchange Act Class against Defendants in amounts to be proven at trial, including pre-judgment and post-judgment interest thereon;

C. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.

Date: June 1, 2026.

Respectfully submitted,
*/s/ Joshua B. Silverman*

**POMERANTZ LLP**
Joshua B. Silverman (*pro hac vice*)
Jaime D. Nolasco Esquivel (*pro hac vice*)
10 S. LaSalle Street, Suite 3505
Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 229-8811
jbsilverman@pomlaw.com

jnolasco@pomlaw.com
*Co-Lead Counsel for Lead Plaintiffs*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Laurence M. Rosen
Ha Sung (Scott) Kim (*appearance forthcoming*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
philkim@rosenlegal.com
lrosen@rosenlegal.com
skim@rosenlegal.com
*Co-Lead Counsel for Lead Plaintiffs*

**LOVELL STEWART HALEBIAN JACOBSON LLP**
John Halebian
Midtown East Office
60 East 42nd Street, 40th Floor
New York, New York 10165
Telephone (212) 500-5010
jhalebian@lshllp.com
*Additional Counsel for*
*Lead Plaintiff Alan Yakuboff*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served this June 1, 2026 via Notice of Electronic Filing, generated and transmitted by the ECF system of the Southern District of New York, to all CM/ECF registrants.

*/s/ Joshua B. Silverman*
Joshua B. Silverman